IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 19, 2007


**CHRIS GRUNDER v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Bedford County
No. 10538   Robert Crigler, Judge**

_____

**No. M2006-01503-CCA-R3-PC - Filed July 11, 2007**

_____


The Petitioner, Chris Grunder, was convicted of especially aggravated kidnapping, aggravated rape, aggravated assault, and theft of property over $500.00.  He filed a petition for post-conviction relief alleging that he was not afforded the effective assistance of counsel at trial.  This petition was denied by the post-conviction court.  Upon a thorough review of the record and applicable law, we find no error and affirm the decision of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Chris Grunder.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Charles F. Crawford, District Attorney General; Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

In summary, the Petitioner's convictions were based on the testimony of the victim and associated witnesses, who presented evidence that the victim left her home after a fight with a friend. She was intoxicated, having drank upwards of ten beers.  While driving through Tullahoma, she stopped to give two men a ride.  While she initially believed one of the men to be a cousin or someone she went to high school with, that turned out not to be the case.  Nevertheless, the two men got into the victim's car, they stopped to get more beer, and they proceeded towards Normandy, Tennessee.  At some point, while driving down Normandy Road, the victim began to become

frightened because the area was fairly wooded and remote. She stopped the car, stating she would not take the two men any further. The man in the back seat then grabbed the victim from behind, holding a knife to her. The Defendant and the other man then pulled the victim from the car, and brutally raped her. The victim lost consciousness and was left at the scene. When she regained consciousness, the police were taking her to the hospital.

The next day, the victim and her friend stopped at a local tobacco store where they spotted the Defendant. The victim yelled at the Defendant, and he "took off" running. The police were called, and the Defendant was found at a nearby house. The victim's car was later found in a parking lot. The Defendant was convicted of aggravated rape, aggravated assault, aggravated kidnapping, and theft of the car.[1]

At the hearing on the post-conviction petition, the Petitioner testified that his counsel at his preliminary hearing was Michael Collins of the Public Defender's Office. After the preliminary hearing, Jack Dearing, also of the Public Defender's Office, took over his case. The date of the offense was August 16, 2002, and he was arrested the next day. At the preliminary hearing in November 2002, the victim testified, and, although there is no tape or transcript of the preliminary hearing, the Petitioner took notes. The Petitioner stated that he observed a number of discrepancies between the victim's testimony at the preliminary hearing and at trial.

First, at the preliminary hearing, the Petitioner claimed the victim testified she left her house at 7:00 p.m., while, at trial, she testified it was at 5:00 p.m. Second, at the preliminary hearing, the Petitioner claimed that the victim testified the Defendant held a knife to her, while, at trial, she said he did not have a knife. Third, at the preliminary hearing, he alleged the victim testified that she picked the Petitioner out of a crowd at the Tobacco Outlet, while, at trial, she stated he was walking across a parking lot in front of her car. Fourth, at the preliminary hearing, the victim did not testify about the Petitioner jumping out of a window, while, at trial, she did. Fifth, at the preliminary hearing, the court asked the victim if her friend was present as a witness, and the victim responded she was just there as a friend. This person testified at trial. Sixth, at the preliminary hearing, the victim did not mention that one of the assailants looked like a relative of hers, while, at trial, she did.

After the preliminary hearing, the Petitioner stayed in jail, and Jack Dearing ("Counsel"), became his attorney. The Petitioner stated that Counsel came to see the Petitioner about six times, most of the time not bringing his file. The Petitioner had questions and requests, to which he claimed counsel never responded. The Petitioner asked Counsel to obtain a transcript of the preliminary hearing because he knew the victim was lying, and the Petitioner asked Counsel to visit potential witnesses. The Petitioner stated none of his requests were completed, and it was six to eight months before the witnesses were interviewed. The Petitioner claimed these witnesses would provide an alibi in that they could testify he was at a bar at 5:00 p.m.

---

[1]A more detailed version of the facts can be found in the opinion from the Petitioner's direct appeal. *See State v Chris Grunder*, No. M2003-01823-CCA-R3-CD, 2005 WL 49647, at *1-10 (Tenn. Crim. App., at Nashville, Jan. 5, 2005), *perm. app. denied* (Tenn. May 23, 2005).

2

The Petitioner further testified he was able to look at the victim's medical records, and he noticed further discrepancies between statements she gave to doctors and her testimony at trial. In the medical report, the victim stated she bit the Petitioner on the penis while he was attempting to have oral sex with her, but she never testified to that at trial. Further, the medical report indicated that the victim's blood alcohol level was a .23, but Counsel did not question the victim on the issue. There was also evidence in the medical report that the victim was depressive and suicidal, but Counsel never questioned the victim on that issue either.

The Petitioner also testified that the victim changed the time of the attack from 7:00 p.m. to 5:00 p.m., and this was important because the Petitioner claimed he was at "BJ and Pauline's" at 7:00 p.m. He stated that he asked Counsel to find BJ and Pauline, but this was not done. Additionally, the Petitioner testified that he asked Counsel to locate Terry Luther and Robert Luther,[2] because the Petitioner claimed the Luthers would be able to testify that the Petitioner was not trying to escape out of the window of their house the day he was arrested. The Petitioner admitted that, although Counsel apparently found the Luthers, they were unable to offer anything helpful.

The Petitioner also claimed that there were no fingerprints or DNA evidence linking him to the crime, and he believed Counsel should have asked more questions about those issues. Also, the Petitioner believed that Counsel did not keep him adequately informed of the progress of his case. The Petitioner testified that, for example, during the breaks at trial, he never spoke with Counsel. The Petitioner also complained that Counsel failed to raise issue with inconsistencies in DNA testing, and that although there were alleged scratch marks on the Petitioner, no pictures were ever taken of the scratch marks or lack thereof. Further, the Petitioner complained that Counsel should have been present when pictures were taken of his tattoos. The Petitioner also claimed Counsel should have gone to Favorite Market to look at videotape, which would have supported his claim that he got out of the victim's car and walked home at around 5:00 p.m. The Petitioner also stated neither he nor the Public Defender's Office ever received one of the two statements made by the victim.

On cross-examination, the Petitioner admitted that Counsel brought some things to him in jail, and he and Counsel discussed the facts of the case. The Petitioner testified that Counsel stated he would attempt to obtain the tape of the preliminary hearing, but, to his knowledge, it was never accomplished. The Petitioner acknowledged that the Public Defender's Office did go to Tullahoma and talked to Terry Luther. The Petitioner admitted his mistake as to the name, and he stated that Counsel did speak with Luther, but Luther's version of the events did not help the Petitioner. The Petitioner stated he was not aware that Luther's recollection coincided with that of the victim. However, the Petitioner stated that Counsel never explained the efforts made to find BJ and Pauline.

The Petitioner acknowledged that Counsel met with two other potential alibi witnesses, both of whom provided no help, and that Counsel questioned witnesses about DNA evidence. The

---

[2]The Petitioner referred to these two men as Terry and Robert Lester. However, as brought out later on cross-examination, Terry and Robert Lester are actually named Terry and Robert Luther.

Petitioner admitted he was told that Counsel went to Favorite Market to ask for the tapes, but he was not aware of this until the sentencing hearing. The Petitioner also could not explain what he believed would have been different had Counsel been present when pictures of his tattoos were taken by the police.

Counsel testified that he worked on the Defendant's case with two investigators. Counsel directed these two investigators on January 21, 2003, to visit the Petitioner, get the names of any witnesses from him, and obtain the preliminary hearing tape. Counsel stated that there were no documents in his file showing any investigation was done prior to January 21; however, he and Collins, the Petitioner's original attorney, talked with the Petitioner prior to that date. Counsel requested discovery on November 19, 2002, and the State responded on January 10, 2003. Counsel admitted that, generally speaking, witnesses' memories are better the sooner they are interviewed. Counsel stated that both of the relevant bartenders were interviewed, and one of the bartenders stated that he had no recollection of the date in question. However, Counsel stated that the Petitioner told him that he did not go to the bar until 9:00 p.m., so any witnesses would have been after-the-fact witnesses. Counsel did admit that this person could be relevant as an after-the-fact witness to describe the Petitioner's appearance and lack of blood.

Counsel further testified that any discussion in the victim's medical file about who attacked her was not inconsistent with what she testified to at trial. Thus, it was a tactical choice not to bring that issue up on cross-examination. In addressing the lack of a photograph of the Petitioner's penis, Counsel stated that there was no allegation of a bite mark, only a bite. So, there was no reason to photograph the penis. Counsel stated he did not intensively cross-examine the victim as to her blood alcohol level because the State had already brought out that evidence. Counsel also testified that evidence regarding the victim's mental health was from several years before trial, and he therefore felt there was no need to address it.

Counsel stated that the main thing he remembered about the victim's testimony at the preliminary hearing was that she said the Petitioner had the knife. At trial, the victim testified that the other man, not the Petitioner, held the knife. Counsel made a tactical decision not to further question the victim on this issue because he did not want to "put the knife in [the Petitioner's] hands . . . ." Counsel and his investigators searched for, but never found, the preliminary hearing tape.

On cross-examination, Counsel testified that he has been an attorney for eight years, and his investigators have up to twenty years experience. Once the Petitioner was indicted, Counsel met with him, and his notes were reduced to a memo in which he requested his investigators interview the Petitioner and possible witnesses. After all the interviews, Counsel determined these potential witnesses had no helpful information. The Petitioner asked Counsel to locate Pauline and BJ close to, or after, trial. Those two individuals were never found. Counsel was never given their last names or addresses. The investigators did locate Terry Luther, but his recollection coincided with that of the victim. The investigators also attempted to obtain the videotapes from the Favorite Market, but those tapes are re-used on a thirty-day cycle. Additionally, there was no camera that focused on the exterior of the store. Counsel stated that the person that the victim initially thought she recognized

4

as her cousin or someone she attended school with was the other assailant. Additionally, Counsel testified that there was no indication that any bite mark to the Petitioner's penis broke the skin, but, even if it had, it would have long since healed by the time Counsel was appointed to represent the Petitioner.

Counsel further testified that he cross-examined the DNA experts concerning the lack of evidence linking the Petitioner to the victim. He also vigorously opposed the photographing of the Petitioner's tattoos. However, the trial court allowed the pictures to be taken. In addressing the venue issue, Counsel stated that all normal procedures were followed during voir dire, and he recalled that three jurors were excused by him for cause. Additionally, any jurors who were exposed to pretrial publicity would have been excused by the trial court. Counsel testified that he met with the Defendant at least ten times, they discussed the facts and developments, he apprised the Petitioner of any developments in discovery, and they also discussed potential defenses and strategies. On re-direct examination, Counsel admitted that, as soon as Collins was appointed, he could have gone to talk to the Defendant about interviewing witnesses.

The trial court determined that the Petitioner had not met his burden of proving ineffective assistance of counsel in that the evidence presented was totally devoid of anything that would have had an effect on the outcome of trial. The court found the defense's strategy was to claim the State had not met its burden of proof, and that was the best strategy in this case. The Petitioner's allegations were generalities, i.e., more could have been done. The trial court found Counsel and the Public Defender's Office did a thorough investigation into the facts and allegations.

The trial court found that the State elicited the testimony concerning the victim's drinking "to try and steal the thunder of cross examination." Even after that, Counsel questioned the victim at length. As to the knife, Counsel made an appropriate strategic decision to cross-examine the victim without affording the victim an opportunity to testify that the knife was actually in the Petitioner's hands. The victim was also questioned about the statements in the medical records, she explained them, and the jury chose to accredit her testimony. The witnesses, BJ and Pauline, were not found by Counsel, nor were they found by the Petitioner for the post-conviction hearing. It was unclear if these people even exist, and it was impossible to say they would have helped the Petitioner in any way. Terry Luther was located and his testimony was not beneficial to the Petitioner. In fact, it supported the victim's version of the events. The two individuals at the bar, whom the Petitioner claimed would provide an alibi, were not able to do so. Counsel also adequately cross examined the witnesses about the lack of the Petitioner's DNA on the victim. As such, the Petitioner's petition was denied.

## II. Analysis

On appeal, the Petitioner claims that the trial court erred in denying the petition for post-conviction relief. He asserts a number of bases for his claim of ineffective assistance of counsel. First, Counsel was ineffective in not cross-examining the victim about what time she left her house, who held the knife, whether she saw the Petitioner in a crowd or walking by her car, whether or not

the Petitioner tried to jump out of a window, what her blood alcohol level was, her mental history, and whether she stated one of the assailants looked like a relative of hers. Second, Counsel did not properly investigate the case in that he failed to interview key witnesses while their memories were fresh enough to remember the Petitioner's whereabouts on the night in question.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688 (1984)).

6

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Id.* at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

First, addressing the Petitioner's claim that Counsel did not appropriately investigate the case, the Petitioner had his preliminary hearing sometime in late August, 2002. He was indicted by the grand jury on November 18, 2002, Counsel submitted discovery requests on November 19, 2002, and the State responded on January 10, 2003. Counsel requested his two investigating officers interview the Petitioner on January 21, 2003, and the Petitioner's leads were tracked down shortly thereafter. Pauline and BJ were neither found by the investigators, nor were they produced at the post-conviction hearing. Terry Luther was found, but his information was not helpful to the Petitioner. The two individuals at the bar were found and they stated they could not remember the day in question. Although it is likely that these individuals' memories would have been clearer had they been interviewed earlier, such speculation is not sufficient evidence upon which to find Counsel was deficient.

In cross-examining the victim, Counsel made the strategic decision not to inquire about inconsistencies in her testimony about who carried the knife. Concerning the victim's drinking, Counsel questioned the victim on this issue for five pages of transcript. The victim also attempted

7

to explain her problems in initially identifying the man whom the Petitioner was with.  The jury heard the evidence on this issue, and the victim's explanation was not wholly inconsistent with her statements in the medical reports.  She initially thought the man with the Petitioner was her cousin or someone with whom she attended high school.  Luther's recollection of the arrest coincided with that of the victim, so there was no need to examine the victim on that issue.  Additionally, whether the Petitioner was spotted in a crowd, or walking by the car are not necessarily inconsistent.

The Petitioner has also alleged the victim should have been questioned about her biting the Petitioner's penis.  However, Counsel testified that there was no evidence of bite marks, only a bite.  The Petitioner also alleges the victim should have been questioned about her past mental problems, but there is no evidence in the record that such testimony would have been admissible.  Counsel stated he believed it was years before the attack, and it was thus irrelevant.  While the victim may have been unsure about the time she was attacked, she was questioned on the issue.  Counsel questioned her, and she responded, "I'm not quite sure at the times because I wasn't even looking at the clock."  Upon review, we conclude that the Petitioner has not proven any deficient performance on the part of Counsel.

We note that virtually all of these alleged inconsistencies relate to the preliminary hearing.  The Petitioner has failed to produce any evidence, besides his personal recollection, of the actual testimony from the preliminary hearing.  Even if we were to accept the Petitioner's recollection, the Petitioner has not proved that cross-examination on any issue Counsel declined to address would have effected the trial.  The Petitioner has not proven Counsel was deficient in his representation or that any of Counsel's actions prejudiced the Petitioner.  He is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authority, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE